### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Baltimore)

| | |
|---|---|
| **HERMAN J. MADDOX** | \* |
| **11253 Greenwood School Road** | |
| **Princess Anne, Maryland  21853** | \* |
| | |
| **Plaintiff** | \* |
| | |
| **JEAN E. MADDOX** | \* |
| **11253 Greenwood School Road** | |
| **Princess Anne, Maryland  21853** | \* |
| | |
| **v.** | \* |
| | |
| **JASON CLEM, M.D.** | \* |
| **401 15th Street, Unit 1** | |
| **Ocean City, Maryland 21842** | \* |
| | |
| **and** | \* |
| | |
| **PAUL MATERA, M.D.** | \* |
| **515 Kansala Drive** | |
| **Annapolis, Maryland 21401** | \* |
| | |
| **and** | \* |
| | |
| **CORIZON HEALTH, INC.** | \* |
| **103 Powell Court** | |
| **Brentwood, Tennessee  37027** | \* |
| **SERVE ON:    The Corporation Trust, Inc.** | |
| **          2405 York Road, Suite 201** | \* |
| **          Timonium, Maryland  21093** | |
| | \* |
| | |
| **Defendants** | \* |

Civil Case No.:

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### COMPLAINT AND PRAYER FOR JURY TRIAL

Plaintiff, Herman J. Maddox ("<u>Plaintiff</u>" or "<u>Mr. Maddox</u>"), by and through his

undersigned counsel, hereby files this Complaint and Prayer for Jury Trial against the

Defendants, Jason Clem, M.D., Paul Matera, M.D., and Corizon Health, Inc. (collectively the "Defendants"), and states in support:

**PARTIES**

1.      At all relevant times hereto, Plaintiff Herman J. Maddox ("Mr. Maddox"), has been a resident of the State of Maryland.  The events described herein occurred while Mr. Maddox was incarcerated at the Eastern Correctional Institution ("ECI"), a prison operated by the Maryland Division of Correction ("DOC").  Mr. Maddox was a single-leg amputee when he arrived at ECI in December 2018, and was thus a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).  Mr. Maddox was released from ECI on or about May 10, 2019.

2.      Plaintiff Jean E. Maddox is the wife of Mr. Maddox and has been a resident of the State of Maryland at all relevant times.

3.      Defendant Jason Clem, M.D. ("Dr. Clem") was a treating physician of Mr. Maddox.  On information and belief, Dr. Clem is a board-certified family medicine physician with no experience or specialization in endocrinology, vascular disease, or surgery.  On information and belief, Dr. Clem was the medical director at ECI at all relevant times.  On information and belief, at all relevant times hereto, Dr. Clem was a resident of the State of Maryland.

4.      Defendant Paul Matera, M.D. ("Dr. Matera") was a treating physician of Mr. Maddox.  On information and belief, Dr. Matera is an internist with no experience or specialization in endocrinology, vascular disease, or surgery.  On information and belief, at all relevant times hereto, Dr. Matera was a resident of the State of Maryland.

5.      Defendant Corizon Health, Inc. ("Corizon") is a corporation with its corporate headquarters and principal place of business located in Brentwood, Tennessee.  Since January 1,

2019, pursuant to its contract with the State of Maryland, Corizon is the sole medical vendor that provides health care and health care services to prisoners and detainees within the DOC.  On information and belief, at all relevant times, Corizon employed Drs. Clem and Matera, and was responsible for the actions of Drs. Clem and Matera in their rendering of health care to Mr. Maddox.  On information and belief, at all relevant times, Corizon carried on regular business in the State of Maryland.

6. On January 13, 2021, Mr. Maddox filed his Statement of Claim in the Health Care Alternative Dispute Resolution Office (HCA No.: 2021-017), and received an Order of Transfer on January 26, 2021, a copy of which is attached as **EXHIBIT A**.

7. With his Statement of Claim, Mr. Maddox filed his Certificate of Qualified Expert, which is attached as **EXHIBIT B**.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985, and pursuant to 42 U.S.C. § 12182, to redress the deprivation under color of law of Mr. Maddox's rights as secured by the United States Constitution.

9. This Court has both federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

10. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to this Complaint occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

11. Drs. Clem and Matera are health care providers within the meaning of CJP § 3-2A-01(f).

12.     The events described herein occurred at ECI, a Maryland state correctional institution.

13.     On information and belief, at all relevant times, Corizon employed Drs. Clem and Matera, who were each acting within the scope of their employment in providing health care to Mr. Maddox.

14.     Prior to his incarceration at ECI in December 2018, Mr. Maddox had a complicated medical history that included a 2009 diagnosis of diabetes mellitus with related complications including a left below the knee amputation in 2014.  Mr. Maddox required insulin to manage his diabetes, and he ambulated with a prosthetic left leg.  Mr. Maddox also suffered from coronary artery disease, peripheral vascular disease, cerebrovascular disease, hypertension, anemia, and glaucoma.  Mr. Maddox took several prescription medications to manage his medical conditions and saw his treating physicians regularly prior to his incarceration.  Mr. Maddox was medically stable when he arrived at ECI in December 2018.

15.     On or about December 10, 2018, Mr. Maddox was sentenced to the DOC for eighteen (18) months.  Following sentencing, Mr. Maddox was sent to the Somerset County Detention Center to await transfer to a long-term institution.

16.     On or about December 13, 2018, Mr. Maddox arrived at ECI on the East Side Compound.  Medical staff performed a comprehensive physical examination on December 17, 2018, and documented Mr. Maddox's complex medical history in the electronic medical health record including the names of Mr. Maddox's medical providers.  Medical staff designated Mr. Maddox as disabled because of his left below the knee amputation and ordered a bottom bunk assignment.  Medical staff also placed Mr. Maddox on a medical diet for his diabetes, and enrolled Mr. Maddox in "chronic care clinics" (mandatory monthly medical evaluations) for his

diabetes and high blood pressure. Medical staff specifically noted that Mr. Maddox's prior left leg amputation was "due to complication from diabetes (non healing wound)."

17.     On December 24, 2018, Mr. Maddox submitted a Sick Call request[1] to ECI medical staff asking for assistance with an ingrown toenail on his right great toe. Mr. Maddox was concerned that he could suffer severe complications if he did not receive medical care for this ingrown toenail given his diabetes and prior complications. Medical staff did not respond to Mr. Maddox's Sick Call request.

18.     On or about December 27, 2018, Mr. Maddox was transferred from the ECI East Compound to the ECI Annex.

19.     On December 31, 2018, and again on January 8 and 13, 2019, Mr. Maddox submitted Sick Call requests for his ingrown right great toenail.

20.     On January 18, 2019, Mr. Maddox was finally seen in the ECI medical department by Stephanie Cyran, NP. Ms. Cyran noted a "severe fungal infection to toenails of R foot." Ms. Cyran ordered a shoe insert for Mr. Maddox's right foot, and noted that Mr. Maddox should remain on a bottom bunk for a period of one year. Ms. Cyran recognized that Mr. Maddox's right foot was at high risk for complications and scheduled him for a podiatry consultation. Ms. Cyran specifically noted, "Due to history of non-healing would to left foot in the past, provider defer clipping of patient's toenails and plan for podiatry consult." However, that consultation did not occur until February 19, 2019. Ms. Cyran discharged Mr. Maddox back to his cell without trimming his toenails.

21.     Over the next several days, Mr. Maddox sent additional Sick Call requests to the ECI medical department out of concern that his right great toenail was becoming dislodged from

---

[1] A Sick Call request is the mechanism that a prisoner must use to request non-scheduled medical care. State regulations require Corizon medical providers to respond to a Sick Call request within 24 hours.

the nail bed.  During this time, Mr. Maddox experienced pain in his right foot, which worsened with each passing day.  Moreover, Mr. Maddox was forced to walk approximately one-quarter (1/4) mile each way to the medical department for his twice-daily insulin.

22.     On January 29, 2019, Mr. Maddox saw Erica McKnight, RN in the ECI medical department.  Ms. McKnight noted that the toenail "dislodged from wound bed" and that the affected area "remained red."  Her assessment at that time was "Potential or actual infection" in the great right toe.  Ms. McKnight cleaned the area with antiseptic and soapy water, applied a gauze dressing to the wound, and discharged Mr. Maddox back to his cell with Band-Aids.

23.     On February 6, 2019—eight (8) weeks after initially requesting help for his ingrown toenail—Mr. Maddox sent another Sick Call request because his right great toenail had fallen off.  Ms. McKnight saw Mr. Maddox later that day and noted that the toenail bed was macerated (softened), and that the toenail had completely fallen off.  Her assessment at that time was "Potential or actual infection."  Ms. McKnight cleaned the area with antiseptic and soapy water, applied a gauze dressing to the wound, and discharged Mr. Maddox back to his cell.

24.     On February 7, 2019, Dr. Matera ordered an x-ray of Mr. Maddox's great right toe, however, it is unclear if the x-ray was actually performed.

25.     On February 7, 2019, Dr. Matera evaluated Mr. Maddox and noted that his right great toenail had fallen off, and that there was a fluid-filled transudate in the nail bed.  Dr. Matera scheduled a follow-up appointment in five (5) days, prescribed the oral antibiotic Keflex, and discharged Mr. Maddox back to his cell.  Mr. Maddox was still required to walk to and from and medical department for his twice-daily insulin.

26.     On February 9, 2019, Mr. Maddox visited the ECI medical department and saw Tracey Hall, RN, for wound care of his great right toe.  Ms. Hall observed signs and symptoms

of a worsening infection, noting "increased warmth, malodorous discharge, increased swelling, increased pain, very malodorous smell, and tunneling with skin breakdown." Her assessment was "Potential or actual infection." Ms. Hall cleaned the area with antiseptic and soapy water, applied a gauze dressing to the wound, and discharged Mr. Maddox back to his cell. Mr. Maddox was still required to walk to and from and medical department for his twice-daily insulin.

27.     Drs. Clem and Matera knew or should have known based on their training and experience that they needed to arrange for a podiatry or vascular surgery consultation within 24-48 hours of Mr. Maddox displaying clear signs of infection on February 6 and 9, 2018. Drs. Clem and Matera knew or should have known that Mr. Maddox was at a high risk for right foot ulcerations and amputations, and that failing to immediately refer him to specialized care would likely result in these life-altering complications.

28.     According to the American Diabetes Association Standards of Medical Care in Diabetes, treating doctors, like Drs. Clem and Matera, should immediately refer patients with infections, like Mr. Maddox, who have histories of prior lower extremity complications or peripheral arterial disease to foot care specialists for ongoing preventive care and lifelong surveillance. The purpose of such specialized care is to address relatively benign issues, like ingrown toenails, before they progress to infections that can threaten the lower extremity and the patient's life.

29.     On February 11, 2019, Mr. Maddox saw Ms. McKnight again for wound care. Ms. McKnight noted "malodorous discharge and increased swelling." Her assessment at that time was "Potential or actual infection." Ms. McKnight cleaned the area with antiseptic and soapy water, applied a gauze dressing to the wound, and discharged Mr. Maddox back to his cell.

Mr. Maddox was still required to walk to and from and medical department for his twice-daily insulin.

30.     On February 13, 2019, Mr. Maddox saw Dr. Matera again after submitting a Sick Call request for immediate medical care.  Dr. Matera diagnosed "gangrene in right great toe" with "auto-amputation distal tip," and ordered that Mr. Maddox be immediately admitted to the ECI infirmary where he could receive IV antibiotics.  Dr. Matera noted that Mr. Maddox "will likely need surgery evaluation and/or further evaluation (MRI)," and sent this note to Dr. Clem. Mr. Maddox was transferred to the ECI infirmary later that day.

31.     Drs. Clem and Matera knew or should have known based on their training and experience that Mr. Maddox's non-healing toe ulcer would likely develop a bacterial infection in the soft tissue that tunnels into the bone, otherwise known as osteomyelitis.  Drs. Clem and Matera knew or should have known that the ability of a patient like Mr. Maddox to heal a foot ulcer depends upon his system delivering a sufficient amount of oxygen to the affected tissues through a competent arterial system, which ability is complicated by the existence of peripheral vascular disease.

32.     Between January 1 and February 13, 2019, ECI personnel ignored Mr. Maddox's medical diet orders and instead fed him a high-starch diet.  During that same period, Mr. Maddox was forced to walk from his cell to the cafeteria for his meals, and to the medical department for his insulin twice a day.  ECI staff and Corizon medical personnel refused to provide Mr. Maddox with a wheelchair or mobility assistance of any kind.  Instead, Mr. Maddox endured tremendous physical pain, several times each day, just to eat and take his life-preserving medication.

33.     Mr. Maddox remained in the ECI infirmary from February 13 to February 18, 2019, and his condition deteriorated.  The right great toe began draining fluid and became even

more swollen.  The tip of the great toe became yellow and the skin began drying out.  Mr. Maddox felt weak, sick, and terrified.  A podiatry appointment was scheduled for February 19, 2019.

34.     On February 19, 2020, Mr. Maddox saw Dr. Peter J. Cuesta, a podiatrist in private practice.  Dr. Cuesta diagnosed gangrene of the right great toe and emphatically recommended immediate inpatient care.  Dr. Cuesta addressed his report to Dr. Clem:  "The patient's current condition warrants in-house care at Peninsula Regional Medical Center.  **The patient's physician was instructed to send him immediately to Peninsula Regional Medical Center** – will coordinate with ECI and PRMC.  All necessary documentation was given to the patient/family." (emphasis supplied).  Dr. Cuesta further noted, "Mr. Maddox needs admission to PRMC for IV antibiotics, MRI of right foot, vascular evaluation and subsequent resection of the right hallux/possibly 1st ray, depending on results of testing."

35.     Despite Dr. Cuesta's diagnosis and urgent recommendation, and Mr. Maddox's high risk for right foot ulcerations and amputations, Dr. Clem refused to arrange a hospital admission for Mr. Maddox.  Instead, Mr. Maddox returned to his cell at ECI.

36.     A medical note written after Mr. Maddox returned to ECI from Dr. Cuesta on February 19, 2019, explains that Dr. Clem approved Mr. Maddox's discharge from the infirmary to general population.  Dr. Clem did not authorize any accommodations for Mr. Maddox, and instead required Mr. Maddox to walk to his meals and to his medication twice a day.  Consequently, Mr. Maddox was forced to walk from his cell to the medical unit—a distance of nearly one-quarter (1/4) mile—four times every day, without the assistance of a cane or wheelchair.  This, despite Mr. Maddox's gangrene right foot with a draining wound, and Dr. Cuesta's urgent recommendation for immediate inpatient hospitalization.

37.     On February 21, 2019, Drs. Clem and Matera documented their receipt of Dr. Cuesta's report, but chose to ignore Dr. Cuesta's recommendations to immediately hospitalize Mr. Maddox.  Instead, Dr. Matera ordered that Mr. Maddox remain at ECI with a follow up by ECI medical staff within three days.

38.     Drs. Clem and Matera knew or should have known from their training and experience that they needed to provide protective footwear to Mr. Maddox given his peripheral neuropathy and active foot infection.  At a minimum, Drs. Clem and Matera knew or should have known that forcing Mr. Maddox to continue walking on his infected right foot (i.e. not placing a medical order in Mr. Maddox's chart to the contrary) presented a substantial risk of serious harm.

39.     On February 22, 2019, Ms. Hall noted "necrosis right great toe" with "foul odor and skin sloughing."  "Sloughing" is the process of shedding or casting off dead cell tissue from the surface of the skin.  Mr. Maddox's necrotic right foot was literally falling off the bone.

40.     On February 25, 2019, Ms. McKnight noted that Mr. Maddox was in "throbbing pain" with "malodorous discharge, swelling, and draining" in the right foot.

41.     On February 26, 2019, Ms. McKnight noted "malodorous discharge, swelling, and draining" with "necrosis extending entire toe."  The medical notes from this day indicates that the previously-ordered MRI had not yet been performed, and that PRMC admission had not yet been coordinated.

42.     On February 27, 2019, Mr. Maddox's daughter spoke with ECI's Assistant Warden, Walter West, out of concern for her father's rapidly deteriorating medical condition. Mr. West stated that he would follow up with the medical director.

43.     On February 28, 2019, Dr. Matera wrote:  "Email sent to concerned parties to determine if MRI and hospital admit is plan in the near future.  Will add doxycycline to treatment plan at this time."  Importantly, there is no documentation in Dr. Matera's note stating that he had examined Mr. Maddox's foot, consulted with Dr. Cuesta, or read and appreciated that the recent descriptions by the nurses of Mr. Maddox's right foot infection showed that it was worsening, and that he was now in a tremendous amount of pain.

44.     On information and belief, Dr. Matera's February 28th note illustrates the approval process that ECI medical staff must follow before a prisoner, like Mr. Maddox, could obtain emergency medical care from an outside provider or hospital.  Specifically, that the ECI medical staff had to first notify the medical contractor, Corizon, of the need for specialized care.  Corizon then had to approve the care before the medical providers could so order or refer.  On information and belief, Corizon routinely denies such specialized care in an effort to minimize the costs of such emergency care, costs that Corizon must pay pursuant to its contract with the State of Maryland.  This practice of delaying necessary emergency medical care is, on information and belief, part of a widespread and systematic pattern and practice by Corizon, especially when they know that a prisoner is close to his release date, like Mr. Maddox was at this time.

45.     On March 1, 2019, Dr. Clem noted, "Right #1 toe likely osteomyelitis.  MRI slated for 3/5/19, then will most likely need amputation with Dr. Cuesta."  There is no documentation in this note that Dr. Clem actually examined Mr. Maddox, or consulted with Dr. Cuesta.

46.     The fact that Mr. Maddox's right great toe infection showed signs of worsening and extension of the infection up the toe, and that Mr. Maddox, who had insensate feet, was

beginning to experience pain in his great toe, clearly suggested that his previous superficial toenail infection had spread into the bone of his right great toe (i.e. osteomyelitis, or infection of the bone). Even at this stage, when Mr. Maddox displayed clear signs of a deep-seated bone infection in his right great toe and needed emergency amputation and expert care, Dr. Clem continued to ignore the expert evaluation and recommendations of Dr. Cuesta from February 19, 2019.

47.     On March 2, 2019, Maryanne Sprout, RN wrote: "Right toe 1 erythema, severity is severe, status is worse," and that Mr. Maddox had "no feeling in the foot."

48.     Another note on March 2, 2019, by Bruce Ford, PA, states that medical staff were "waiting for MRI and follow up admit to the hospital for amputation of the toe."

49.     On March 3, 2019, Ruth Campbell, PA noted that Mr. Maddox "has had progressive worsening of his foot" and that his right "toe continues to become more necrotic." At this time, Mr. Maddox complained of terrible pain, swelling, and drainage of the right foot, with worsening in the right great toe.

50.     A March 4, 2019 by Dr. Clem states, "MRI slated for tomorrow, then will likely need amputation."

51.     Another note on March 4, 2019 by Amanda Morris, RN states that Mr. Maddox was in pain and asked, "Why does my toe hurt so bad?" Ms. Morris also documented that Mr. Maddox's right great toe was "foul smelling, black in color."

52.     March 5th came and went with no MRI.

53.     March 6th came and went with no MRI.

54.     On March 7, 2019, Ms. Sprout noted that Mr. Maddox "complains he cannot sleep with foot elevated as it throbs." Ms. Sprout further noted, "Right foot great toe wound

smells bad, very odorous, increased pain and edema related to the necrotic great toe and surrounding tissue."

55.     Another March 7th note by Dr. Clem indicates that the "MRI was not done the other day for reported paperwork issues."   On information and belief, paperwork deficiencies and similar administrative snafus are commonplace in Corizon's administration—or failure to administer—medical care at ECI, especially when such care involves a referral to an outside specialist or for diagnostic testing.   On information and belief, the "paperwork issues" that prevented Mr. Maddox's MRI on March 5 resulted from Dr. Clem failing to sign the MRI order. On further information and belief, the lack of oversight or monitoring by Corizon and/or DPSCS of prisoners with serious ongoing medical needs allows these administrative errors and delays or denials in treatment.

56.     On March 8, 2019, Dr. Clem noted that the right foot MRI was now scheduled for March 11, 2019 at PRMC.   This note states that Dr. Clem spoke with Dr. Cuesta about proceeding with the amputation of the great right toe after the MRI was complete.

57.     Another March 8th note by Ms. Frey indicates that the "necrotic area deepened."

58.     On March 9, 2019, Melinda Tieskotter, RN noted "necrotic tissue present – area between great toe and 2nd toe at base noted small amount bloody drainage dry dressing applied." This note also states that Mr. Maddox complained of 10/10 pain, and was provided a cane and urinal at his bedside.

59.     On March 10, 2019, Ms. Tieskotter noted that Mr. Maddox had a "decreased appetite and noted not able to sleep" because of his pain.   During this visit, Mr. Maddox was "rocking while witting up on edge of bed with facial grimace."   Mr. Maddox reported his pain level as a "12 on a 0/10 pain scale."

60.     On March 11, 2019—three weeks after Dr. Cuesta ordered immediate inpatient hospitalization—Mr. Maddox was transported to PRMC for the MRI of his right foot, after which he was brought back to the ECI infirmary.

61.     On March 12, 2019, Elizabeth Miller, RN noted that Mr. Maddox was "complaining of constant pain in his foot and it is cold."  She noted that the "right great toe is foul smelling."  Her note further states that Mr. Maddox explained "he does not have good circulation which is why his foot is cold."

62.     On March 13, 2019, Dr. Clem indicated that he received the MRI results that showed "distal phalanx obscured, no sign abscess, suggest x-ray correlation."  Dr. Clem noted that he would follow up with Dr. Cuesta and discuss next steps.

63.     On March 14, 2019, Dr. Clem noted "no change in appearance, still shriveled and necrotic appearance, not viable tissue, odor from area has increased."  Dr. Clem's note also indicates that Dr. Cuesta "suggests amputation of that great toe to prevent further spread."

64.     Despite the fact that Mr. Maddox's right great toe looked shriveled and necrotic (i.e. dead tissue) without the hope of recovery, and despite the documentation that Dr. Clem consulted with Dr. Cuesta on March 14, 2019, who again recommended amputation of the right great toe to prevent spread, Dr. Clem ignored this advice and did not immediately transfer Mr. Maddox for that amputation.

65.     Another March 14th note by Ms. Tieskotter states that Mr. Maddox was in "throbbing pain this am with difficulty sleeping last night."

66.     On March 15, 2019, Ms. Campbell noted:  "64 y/o AAM with worsening necrosis of right toe and into foot with increasing swelling, redness and drainage greenish.  Odor of the foot has increased, pt notes pain has radiated into his right thigh as well as worsened in the right

foot."  Her note continued:  "right foot, leg, painful and draining from the right foot with necrotic great tow and black sloughing into the foot with redness and swelling.  Right foot - necrosis of right great toe into right foot with pus draining between the great toe and 2nd digit, redness into lower leg, tender to palpitation from the foot into leg into right thigh."

67.     It was only after Mr. Maddox's right great toenail infection had progressed to a deep-seated, intensely painful, life-threatening infection that Dr. Clayton Raab was consulted and recommended immediate hospitalization.

68.     On March 15, 2019, Mr. Maddox was finally transported by ambulance to Atlantic General Hospital ("AGH").   The initial examination upon arrival there revealed extensive dead tissue extending past the base of the right great toe:  "necrotic tissue overlying the right great toe (extending past MTP joint), with significant areas of fluctuance (sic) along lateral part of right great toe."  Mr. Maddox's laboratory studies indicated that he had systemic illness secondary to his severe right great toe infection.  His white blood cell count and erythrocyte sedimentation rate were markedly elevated, all signs of severe systemic illness emanating from Mr. Maddox's deep-seated severe right foot infection.

69.     Importantly, AGH does not have a vascular surgery unit.  As such, AGH was only marginally qualified to perform the right great toe amputation given Mr. Maddox's complex history of vascular disease.  Moreover, Dr. Cuesta specifically recommended, and Dr. Clem accepted PRMC as the appropriate hospital to perform the amputation.  This was especially important because Mr. Maddox's vascular surgeon, Dr. Kerrigan,[2] had privileges at PRMC, and Mr. Maddox previously underwent his left below the knee amputation at PRMC.  Further still, PRMC is approximately half the distance to ECI as compared to AGH.  On information and

---

[2] Dr. David C. Kerrigan, a vascular surgeon, had previously operated on Mr. Maddox, having performed his prior left below knee amputation in 2014.

belief, Corizon made the decision to transfer Mr. Maddox to AGH instead of PRMC as part of a policy and/or custom of employing cost-cutting measures at the expense of providing adequate health care to its prisoner patients.

70.     On March 16, 2019—nearly four (4) weeks after Dr. Cuesta ordered immediate inpatient hospitalization—Mr. Maddox underwent surgery to amputate his right great toe.  The March 16, 2019 surgical pathology note states:  "Gangrenous necrosis with calcific arteriosclerosis.  The skin/soft tissue margin is non-viable and contains acute inflammatory infiltrates."

71.     In delaying hospitalization and expert wound management for thirty-four (34) days (from February 9, 2019 to March 15, 2019), Drs. Clem and Matera had allowed a manageable right great toe infection to advance to a deep-seated, life-threatening infection that spread far past the base of the toe.  The surgical pathology on the right great toe amputation demonstrated dead, necrotic tissue and active inflammation at the margins of the surgical resection.  These findings made clear that Mr. Maddox needed a more aggressive right below knee amputation as of March 16, 2019.  That amputation, however, **did not occur for another 62 days**.

72.     Mr. Maddox remained at AGH until March 25, 2019.  The discharge instructions from AGH included a follow-up appointment with Dr. Wilhite, a vascular surgeon, to "consider revascularization attempt vs BKA."

73.     On March 24, 2019, Ms. Tieskotter noted in Mr. Maddox's ECI medical records that she had spoken to AGH concerning Mr. Maddox's discharge, and that Mr. Maddox "will need f/u appt w/vascular Dr. Kerrigan."  Her note further states that she updated Dr. Clem "via phone and faxed records placed in mailbox for further review."

74.     Mr. Maddox returned to ECI from AGH on March 25, 2019.  Mr. Maddox's condition continued to worsen.  Mr. Maddox was forced to change his own surgical bandages in the ECI infirmary because the nursing staff either refused or stated that they did not feel qualified to help with would care.  Mr. Maddox had limited access to the telephone and no recreation time. ECI refused to provide Mr. Maddox with a wheelchair and instead forced him to walk with a cane, on a poorly wrapped amputation wound.  Showering was nearly impossible and medical staff offered no assistance.  ECI continued Mr. Maddox on a high-starch diet, despite medical orders to the contrary because of his diabetes.  Mr. Maddox complained about his worsening condition daily to the ECI medical providers, including Drs. Clem and Matera.  Mr. Maddox lived each day in sheer terror because he could feel his body deteriorating.

75.     On March 26, 2019, Dr. Clem noted that he "will place consult for Vascular Surgery eval Dr. Wilhite."  However, the records are devoid of Dr. Clem scheduling any such vascular evaluation, or even calling Dr. Wilhite's office to discuss Mr. Maddox's condition.

76.     On March 28, 2019, Dr. Clem noted that Mr. Maddox was "still with discomfort around lower foot and ankle," and that a vascular "consult [was] placed and awaiting scheduling for eval."

77.     Later on March 28th, Dr. Raab evaluated Mr. Maddox, and then reviewed his condition by telephone with Dr. Clem.  Dr. Raab's note states:  "I have had a discussion with Dr. Clem over the need to move rapidly before this grossly infected poorly perfused foot becomes an active or more aggressive infection, etc."

78.     On March 29, 2019, Dr. Clem contacted Dr. Whilhite and Dr. Kerrigan's offices to arrange evaluations with each of them for consideration of below knee amputation on the right leg.

79. On April 1, 2019, Mr. Maddox saw Dr. Kerrigan for a surgical evaluation of the right leg. Dr. Kerrigan noted "new extensive gangrenous change and tissue loss of the right foot with the plantar surface 60%, and dead. There is a **hole** of [sic] the bottom of his foot to the top of the right great toe amputation site." (emphasis supplied). Dr. Kerrigan commented, "Right foot somehow with a series of events became extremely gangrenous and is now non-salvageable." Dr. Kerrigan concluded that a below knee amputation was necessary to save Mr. Maddox's right leg from the rapidly growing infection noting, "It is hoped that right below-knee amputation will heal." Dr. Kerrigan ordered:   "**Patient needs urgent right below-knee amputation for gangrene.**" (emphasis supplied). Next to his order, Dr. Kerrigan noted that Mr. Maddox now has cardiac clearance for the surgery, meaning that the only thing left to do was to schedule the procedure.

80. **Mr. Maddox did not undergo surgery for another 62 days**, until May 17, 2019—seven days after his release from ECI.

81. Drs. Clem and Matera caused this delay in necessary—indeed, life preserving—medical care despite clear and obvious signs that a life-threatening, deep-seated right foot infection was growing up Mr. Maddox's leg, causing his skin to literally die, turn black, and fall off of the bone. Photographs attached as **EXHIBIT C** depict the condition of Mr. Maddox's right foot and leg upon his admission to PRMC on May 14, 2019.

82. At all relevant times, Drs. Clem and Matera knew of Mr. Maddox's complex medical history and of Mr. Maddox's propensity to diabetes-related complications, including foot ulcers that required amputation. Drs. Clem and Matera further knew that Mr. Maddox's peripheral vascular disease made it difficult for his right toe to heal and thus required early,

efficient, and effective expert care as soon as it became clear in early February 2018 that the right great toe ulcer was quickly deteriorating.

83.     Drs. Clem and Matera breached the standard of appropriate medical care in failing to immediately refer Mr. Maddox to a podiatrist for his right great toe infection given his previous complications and amputations.  Drs. Matera and Clem likewise failed to diagnose and treat the obvious signs of infection as Mr. Maddox's right great toe infection worsened.

84.     In failing to properly diagnose and treat Mr. Maddox, Drs. Matera and Clem caused Mr. Maddox to needlessly suffer—with a life-threatening and unbearably painful infection—for nearly five full months.

85.     Moreover, in failing to properly diagnose, treat, and refer Mr. Maddox to a podiatrist before his right great toe deteriorated, Drs. Clem and Matera caused Mr. Maddox to develop a deep-seated infection in the right foot, which required two separate amputation surgeries.

86.     As a direct and proximate result of Dr. Matera and Clem's failure to properly diagnose and treat Mr. Maddox's infection, Mr. Maddox suffered in agony for several months without proper medical attention, feared for his life and well-being each day, suffered, and will continue to suffer, painful and permanent bodily injury, mental anguish, and other related injuries.  Mr. Maddox also lost sixty (60) pounds during his term of confinement at ECI because ECI personnel and Drs. Clem and Matera failed to implement his restricted diet.

87.     Most notably, Dr. Clem and Matera's failures robbed Mr. Maddox of the ability to independently ambulate for the remainder of his life.

88.     The aforementioned negligent conduct of Drs. Clem and Matera caused injury to Mr. Maddox's marital relationship, including a loss of society, affection, assistance, companionship, and sexual relations.

89.     Mr. Maddox is now 66 years old.  Mr. Maddox's damages include permanent disability and disfigurement, severe pain, decreased life expectancy, strength loss, past and future medical expenses, past and future embarrassment and humiliation, and past and future loss of ability to enjoy the pleasures of life.

### *Corizon's Financial Incentives to Minimize Outside Referrals*

90.     On information and belief, Corizon's contract with the State of Maryland for the relevant time contained financial incentives that encouraged Corizon to reduce outpatient referrals and hospitalizations of prisoners in outside facilities.  Corizon's procedure for approving referrals is extensive and requires several stages of approval before a prisoner can be approved for outside care.  Corizon's treatment policies similarly encourage conservative care to cut costs, which causes its employees to withhold necessary medical care from prisoners with serious medical conditions requiring outside care or costly medications.  Mr. Maddox was one such prisoner.

91.     On information and belief, the delays in referring Mr. Maddox to an outside specialist and scheduling diagnostic testing were motivated in part by the financial incentives of Corizon's contract with the State of Maryland to minimize outside referrals, and by Corizon's policies and procedures requiring several stages of approval before a prisoner can be approved for outside care or costly procedures and medications.

92.     On information and belief, Corizon's aforementioned delays were also motivated by the financial incentives of its contract with the State of Maryland in that Corizon was paid a

flat fee ($680 million) for the five-year duration of its contract.  The flat fee represents Corizon's earning ceiling for the relevant time regardless of how many prisoners Corizon treats or what type of treatment it provides.  In other words, the flat fee incentivizes Corizon to minimize the cost of medical care it provided to all Maryland prisoners, including Mr. Maddox.

### *Corizon's Pattern and Practice of Inadequate Medical Care*

93.     It is a generally accepted medical principle that the sooner an infection is diagnosed and treated, the better a patient's chance for a favorable prognosis.  This is especially true with a patient who has increased risk factors for infection-related complications, like peripheral vascular disease.

94.     Corizon provides healthcare in prisons, including ECI, under the HMO model, with an emphasis on cutting costs—except that prisoner patients have no other options to obtain medical care except through Corizon.  Corizon is a for-profit company, which means that its board of directors answers to investors and stockholders, not to patients.  Accordingly, Corizon's medical providers are constantly pressured to do more with less.

95.     Corizon's policy and/or custom is to provide the least amount of medical care possible, and to delay that care as long as possible.  This manifested itself in Corizon and Drs. Clem and Matera not promptly referring Mr. Maddox to a podiatrist or other wound care specialist upon the first signs of a right great toe infection, and by not ordering necessary diagnostic testing for Mr. Maddox.

96.     Corizon's policy and/or custom was to not refer patients to outside specialists or for off-site diagnostic testing even when clear signs of gangrene are present.  This resulted in a significant delay in diagnosing and treating Mr. Maddox, until it was too late to save his right

toe, and ultimately his right leg below the knee.  As a result, Mr. Maddox is permanently disabled and suffers from a condition that was made more severe with the passage of time.

97.     Corizon's policy and/or custom was to have limited doctors available to examine, evaluate, and treat prisoner patients, so that medical care for prisoners was severely rationed, including medical care for seriously ill patients, like Mr. Maddox.  This included Corizon's failure to adequately staff prison facilities, including ECI, with qualified medical professionals who were trained in addressing severe medical conditions.  Corizon has known that limited access to specialists is putting its prisoner patient population at risk.

98.     Corizon's policy and/or custom was to treat symptoms rather than to determine the root causes of problems presented by its prisoner patients.  This resulted in significant delay in diagnosing and treating Mr. Maddox, until it was too late to prevent permanent damage.

99.     Corizon's policy and/or custom was to ignore or otherwise refuse to follow the orders and recommendations of outside specialists, even when those recommendations concerned an immediate risk to the health and safety of a prisoner patient, like Mr. Maddox.

100.     On information and belief, several other Maryland prisoners have suffered serious diabetes-related complications since Corizon became the exclusive prison medical contractor on January 1, 2019.   On information and belief, these complications include osteomyelitis secondary to ingrown toenails, and avoidable amputations secondary to infection.   On information and belief, this pattern demonstrates that Corizon fails to adequately staff its facilities with qualified physicians, and/or fails to train its physicians on proper diabetes and wound care management protocols.  On information and belief, Corizon's failures have caused, and continue to cause constitutional harm to other prisoners in the State of Maryland.

101.    Corizon's policy and/or custom was to ignore or otherwise fail to comply with statutory and regulatory requirements pertaining to the delivery of necessary medical care to prisoner patients.

102.    Corizon was deliberately indifferent in its policies and customs, including but not limited to inadequate training in treating prisoners with severe medical conditions.

103.    A 2011 audit by the Maine State Legislature, for example, found that Corizon had systemic failures in:   (a) administering and recording medications; (b) maintaining accurate medical records; (c) responding to sick call requests; and (d) training its medical professionals.[3]

104.    In 2019, Dr. Marc Stern, a correctional healthcare consultant, issued an exhaustive expert report at the request of U.S. District Court Judge Roslyn Silver.[4]  Judge Silver tasked Dr. Stern with preparing a report concerning the implementation of court-imposed performance benchmarks in rendering healthcare to Arizona prisoners.  Corizon was the medical contractor in Arizona at all relevant times to Dr. Stern's report.  Among the myriad failures and barriers to competent medical care discussed, the report found that Corizon routinely understaffed prison facilities and ignored requests to cure understaffing problems.  The report also describes Corizon supervisors who instructed employees to cancel requests for outside referrals and specialized care when they anticipated delays in identifying a specialist in the community.  The report even describes Corizon's failures to take any action after the avoidable death of a prisoner who died because of numerous system errors, despite formal recommendations by a Mortality Review Committee.

---

[3] *See* https://www.maine.gov/legis/opega/GOC/GOC_meetings/Current_handouts/11-15-11/MEDSERV%20Final%20Report%2011-10-11.pdf.  In 2011, Corizon was known by its former corporate name Correctional Medical Services, or CMS.
[4] *See Parsons v. Ryan, et al.*, 2:12-cv-00601-ROS, ECF 3379 (D. Az. Oct. 4, 2019).

105.    There are reports from dozens of states where Corizon provides medical care to prisoners detailing Corizon's staff shortages, inadequate training, failures to refer to specialists, failures to order diagnostic testing, and cost-cutting measures at the expense of adequate medical care.

106.    On information and belief, Corizon was aware of its constitutionally inadequate medical care in Maryland, and specifically at ECI during the relevant time, yet it failed to properly address those inadequacies and instead chose to continue operating with its profit motives placed before its requirement to provide sufficient medical care to Maryland prisoners, including Mr. Maddox.  Despite this knowledge, Corizon failed to properly train and supervise its medical personnel, failed to adequately staff its facilities, and either affirmatively or tacitly approved a policy of providing minimal medical care at best to Maryland prisoners.

107.    On information and belief, Corizon trained its medical providers, including Drs. Clem and Matera, to implement its cost-cutting policies and procedures that discouraged, *inter alia*, outpatient care and surgical treatment.  Moreover, Corizon engaged in a practice and/or custom at the corporate level whereby it ignored entirely, or delayed implementation of medically necessary orders and referrals as determined by its treating physicians.

108.    Here, Corizon's specific conduct, together with Drs. Clem and Matera's deliberate indifference, deprived Mr. Maddox of his Eighth Amendment right to be free from cruel and unusual punishment.  Indeed, Drs. Clem and Matera's deliberate indifference and constitutionally inadequate medical care could not have occurred without Corizon's express approval or tacit authorization.

## COUNT I:  NEGLIGENCE
### (HERMAN J. MADDOX V. ALL DEFENDANTS)

109.   Mr. Maddox adopts and incorporates the previous paragraphs as if fully set forth herein.

110.   As described herein, Drs. Clem and Matera were negligent in their care and treatment of Mr. Maddox, in that they failed to care for and treat Mr. Maddox in accordance with the standard of skill required of, and ordinarily exercised by, the average qualified physician engaged in medical practice at a professional level.

111.   As further described herein, Corizon was negligent in staffing, overseeing, monitoring, and training its medical professionals, and was further negligent in denying or delaying necessary medical care to Mr. Maddox.  Corizon failed to ensure that proper controls and/or protocols were in place to monitor prisoners with severe chronic illness, to provide disabled prisoners with assistive devices to help them ambulate and perform their activities of daily living and survival, to respond to prisoners' acute conditions and severe medical symptoms, to refer prisoners with acute medical conditions to specialists, or to provide prisoners with appropriate treatment for their medical conditions while housed at ECI.

112.   As a direct and proximate result of Corizon, Dr. Clem, and Dr. Matera's negligence, Mr. Maddox suffered, and continues to sustain, physical and emotional injuries and damages.

113.   Mr. Maddox suffered and continues to suffer physical and mental anguish occurring as a direct result of the negligence and the breaches of the standard of reasonable medical care by the Defendants, without any negligence of Mr. Maddox contributing thereto.

114.     Mr. Maddox suffered two unnecessary amputations—his right great toe, and his right leg below the knee—which occurred as a foreseeable and direct result of the negligence and the breaches of the standard of reasonable medical care by the Defendants, without any negligence of Mr. Maddox contributing thereto.

**WHEREFORE,** Plaintiff Herman J. Maddox, demands judgment against the Defendants, Jason Clem, M.D., Paul Matera, M.D., and Corizon Health, Inc. for damages in excess of Seventy Five Thousand Dollars ($75,000.00), plus costs, and such other and further relief as this Court deems appropriate.

### COUNT II:  LOSS OF CONSORTIUM
#### (JEAN E. MADDOX V. ALL DEFENDANTS)

115.     Mr. Maddox, together with Plaintiff Jean E. Maddox (collectively "Plaintiffs"), adopt and incorporate the previous paragraphs as if fully set forth herein.

116.     Plaintiffs were husband and wife at all relevant times and continue to be husband and wife.

117.     The negligence conduct of the Defendants, more specifically described in Count I, caused injury to the marital relationship of Plaintiffs, including a loss of society, affection, assistance, companionship, and sexual relations.

**WHEREFORE,** Plaintiffs demand judgment against the Defendants, Jason Clem, M.D., Paul Matera, M.D., and Corizon Health, Inc. for damages in excess of Seventy Five Thousand Dollars ($75,000.00), plus costs, and such other and further relief as this Court deems appropriate.

**COUNT III:  42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
(HERMAN J. MADDOX V. CLEM AND MATERA (IN THEIR INDIVIDUAL CAPACITIES)
AND CORIZON)**

118.    Plaintiff, Herman J. Maddox, adopts and incorporates Paragraphs 1 through 108 as fully set forth herein.

119.    As described herein, Corizon, Dr. Clem, and Dr. Matera acted with deliberate indifference to Mr. Maddox's known, serious medical needs, depriving Mr. Maddox of his constitutional guarantee to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  In addition, such conduct deprived Mr. Maddox of his substantive due process right under the Fourteenth Amendment to the United States Constitution.

120.    Dr. Clem, Dr. Matera, and Corizon were acting under color of state law at the time of their deliberately indifferent acts and omissions and violated Mr. Maddox's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution.

121.    Mr. Maddox suffered substantial injuries as damages as a direct result of the Defendants' violations and deprivations of his constitutional rights.

**WHEREFORE,** Plaintiff Herman J. Maddox, demands judgment against the Defendants, Jason Clem, M.D., Paul Matera, M.D., and Corizon Health, Inc. for damages in excess of Seventy Five Thousand Dollars ($75,000.00), attorneys' fees pursuant to 42 U.S.C. § 1988, punitive damages, costs, expert witness fees, legal interest from the date of these Defendants' actions and omissions, and such other and further relief as this Court deems appropriate.

## COUNT IV: 42 U.S.C. § 12182
### Violation of the Americans With Disabilities Act
(HERMAN J. MADDOX V. CORIZON)

122.   Mr. Maddox adopts and incorporates paragraphs 1 through 108 as if fully set forth herein.

123.   Title III of the Americans With Disabilities Act ("ADA") prohibits "discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  A private entity, like Corizon, is considered to offer public accommodations "if the operations of such entities affect commerce-- . . . professional office of a health care provider, hospital, or other service establishment[.]"  42 U.S.C. § 12181(7)(F).  Corizon is under contract to provide medical care to incarcerated prisoners in the State of Maryland and therefore qualifies as a health care provider under the ADA.  Corizon's acts and omissions, as described herein, denied Mr. Maddox access to medically appropriate services as required by the ADA.

**WHEREFORE**, Plaintiff Herman J. Maddox, demands judgment against the Defendant, Corizon Health, Inc., for damages in excess of Seventy Five Thousand Dollars ($75,000.00), attorneys' fees, costs, expert witness fees, and such other and further relief as this Court deems appropriate.

### COUNT V:  MARYLAND DECLARATION OF RIGHTS, ARTICLES 16 AND 25
(HERMAN J. MADDOX V. CLEM, MATERA, & CORIZON)

124.   Mr. Maddox adopts and incorporates Paragraphs 1 through 108 as fully set forth herein.

125.   The Defendants were acting under the color of state law and within the scope of their employment at the time of their deliberately indifferent and/or negligent acts and omissions.

126.    As described above, the Defendants acted with deliberate indifference and/or negligence to Mr. Maddox's known serious medical needs, depriving him of his right to be free from cruel and unusual punishment under Articles 16 and 25 of the Maryland Declaration of Rights.

127.    The Defendants' deliberately indifferent and/or negligent acts and omissions caused Mr. Maddox to suffer actual physical and emotional injuries, severe pain and suffering, mental anguish, and ultimately, the amputation of his leg.

**WHEREFORE,** Plaintiff Herman J. Maddox, demands judgment against the Defendants, Jason Clem, M.D., Paul Matera, M.D., and Corizon Health, Inc. for damages in excess of Seventy Five Thousand Dollars ($75,000.00), plus costs, and such other and further relief as this Court deems appropriate.

Respectfully submitted,

**David Daneman, CPF #8912180145**
**Allen E. Honick, CPF #1612130266**
**WHITEFORD, TAYLOR & PRESTON, L.L.P.**
Seven St. Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
(410) 347-8700
ddaneman@wtplaw.com
ahonick@wtplaw.com
*Attorneys for Plaintiffs,*
  *Herman J. Maddox and Jean E. Maddox*

*11655373*

- 29 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore)**

| | | |
|---|---|---|
| **HERMAN J. MADDOX,** *et al.* | * | |
| **Plaintiff** | * | |
| **v.** | * | **Civil Case No.:** |
| **JASON CLEM, M.D.,** *et al.* | * | |
| **Defendants** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>PRAYER FOR JURY TRIAL</u>

Plaintiffs request that the above-captioned matter be tried before a jury.

Respectfully submitted,

_____

**David Daneman, CPF #8912180145**
**Allen E. Honick, CPF #1612130266**
**WHITEFORD, TAYLOR & PRESTON, L.L.P.**
Seven St. Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
(410) 347-8700
ddaneman@wtplaw.com
ahonick@wtplaw.com
*Attorneys for Plaintiffs,*
  *Herman J. Maddox and Jean E. Maddox*

*11655373*